# EXHIBIT 1

Page 1 of 3

DATE  06/17/15


OCTA

**PURCHASE ORDER**  A32131

| | |
|---|---|
| FOB: | NO DESCRIPTION |
| BUYER: | LUIS MARTINEZ |

TO:   SHAREPOINT360
     701 B. STREET
     SUITE 1601
     SAN DIEGO  CA  92101

ATTN:  LESLIE     MILLER
PHONE:  877-819-6360

SHIP TO:  PO - ADMINISTRATION BUILDING
     600 S MAIN ST
     ORANGE, CA 92868

REQUESTOR:   SOUZAN NAJARI

BILL IN DUPLICATE TO:
Orange County Transportation Authority
550 South Main Street
P.O. Box 14184
Orange, California 92863-1584
Attn: Accounts Payable

PAYMENT WILL NOT BE MADE UNLESS VENDOR'S IN-
VOICE INDICATES THE PURCHASE ORDER NUMBER.

| ITEM NO. | QTY. | U/M | STOCK NO. | DESCRIPTION | DELIVERY DATE | TERMS | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| | | | | Effective July 1, 2015 through June 30, 2016 for the annual hosting services for Sharepoint 2010 Enterprise, Contract Manager 13 and InfoMaker Virtual Private Hosting Servers for the Information Systems Department. | | | | |
| 001 | | | | Sharepoint 2010 Enterprise Hosting and OCTA Today Internal Intranet | 06/30/16 | NET-030 1282-7612-A5352-9RS | | $28,584.55 |
| 002 | | | | Contract Manager 13 and InfoMaker Virtual Private Server Hosting | 06/30/16 | NET-030 1282-7612-A5352-9RS | | $27,360.00 |
| | | | | The Service Level Agreement is in reference to Exhibit A on PO A29140 | | | | |
| | | | | The following attachment is appended hereto and by this reference incorporated herein: | | | | |
| | | | | Exhibit B, entitled "Scope of Work" | | | | |
| | | | | DELIVERY SHALL BE BY ELECTRONIC DOWNLOAD ONLY. NO TANGIBLE ITEMS WILL BE ACCEPTED. | | | | |
| | | | | VERBAL ADDITIONS, DELETIONS, OR MODIFICATIONS OF ANY KIND TO THIS PURCHASE ORDER SHALL BE  CONSIDERED UNAUTHORIZED AND INVALID.  DO NOT  ACCEPT VERBAL MODIFICATIONS FROM ANY EMPLOYEE,  AGENT OR IMPLIED AGENT OF THE ORANGE COUNTY TRANSPORTATION AUTHORITY.  VALID MODIFICATIONS TO THIS PURCHASE ORDER SHALL BE IN THE FORM OF A WRITTEN AMENDMENT, SIGNED BY AN AUTHORIZED MEMBER OF THE ORANGE COUNTY TRANSPORTATION AUTHORITY PROCUREMENT STAFF. | | | | |

**ORANGE COUNTY TRANSPORTATION AUTHORITY**

BY: _____

FORM NO. CAMM-019 (10/91)

OCTA GENERAL PROVISIONS FOUND ON
PAGE 3 ARE INCORPORATED HEREIN.

NOT SUBJECT TO TRANSPORTATION OR
FEDERAL EXCISE TAX.

**PURCHASING**

| | |
|---|---|
| **SUBTOTAL** | |
| **SALES TAX** | |
| **TOTAL** | |

Page 2 of 3

DATE  06/17/15

**OCTA**

**PURCHASE ORDER**  A32131

| FOB: | NO DESCRIPTION |
|------|----------------|
| BUYER: | LUIS MARTINEZ |

TO:   SHAREPOINT360
      701 B. STREET
      SUITE 1601
      SAN DIEGO  CA  92101

ATTN:   LESLIE     MILLER
PHONE:   877-819-6360

SHIP TO:  PO - ADMINISTRATION BUILDING
          600 S MAIN ST
          ORANGE, CA 92868

REQUESTOR:   SOUZAN NAJARI

BILL IN DUPLICATE TO:
Orange County Transportation Authority
550 South Main Street
P.O. Box 14184
Orange, California 92863-1584
Attn: Accounts Payable

PAYMENT WILL NOT BE MADE UNLESS VENDOR'S IN-
VOICE INDICATES THE PURCHASE ORDER NUMBER.

| ITEM NO. | QTY. | U/M | STOCK NO. | DESCRIPTION | DELIVERY DATE | TERMS | UNIT PRICE | EXTENSION |
|----------|------|-----|-----------|-------------|---------------|-------|------------|-----------|
| | | | | PAYMENT UPON APPROVAL OF CORRECT AND COMPLETE INVOICE.  A CORRECT AND COMPLETE INVOICE SHALL CONSIST OF AT LEAST THE FOLLOWING ELEMENTS: PURCHASE ORDER NUMBER, DATE OF ORDER, INVOICE NUMBER, DATE OF INVOICE, CONTRACT PAYMENT TERMS, NAME OF BUYER OR CONTRACT ADMINISTRATOR, LINE BY LINE LISTING OF ALL ITEMS BEING INVOICED AND IDENTIFICATION OF INVOICING FIRM. ANY COSTS INCURRED IN EXCESS OF THE TOTAL AMOUNT OF THIS PURCHASE ORDER, WITHOUT BEING AMENDED, SHALL BE CONSIDERED UNAUTHORIZED, AND AS SUCH MAY NOT BE PAID. | | | | |

**ORANGE COUNTY TRANSPORTATION AUTHORITY**

BY: _____

FORM NO. CAMM-019 (10/91)

OCTA GENERAL PROVISIONS FOUND ON
PAGE 3 ARE INCORPORATED HEREIN.

NOT SUBJECT TO TRANSPORTATION OR
FEDERAL EXCISE TAX.

**PURCHASING**

| SUBTOTAL | $55,944.55 |
|----------|-----------|
| SALES TAX | $0.00 |
| TOTAL | $55,944.55 |

## ORANGE COUNTY TRANSPORTATION AUTHORITY - GENERAL PROVISIONS

**INSPECTION AND ACCEPTANCE** - All items are subject to final inspection and acceptance by OCTA at destination notwithstanding any payment or prior inspection at SELLERs facilities. Final inspection will be made within a reasonable time after receipt of items hereunder.

**CHANGES** - By written notice only. OCTA may, from time to time, order work suspension or make changes in quantities, drawings, designs, specifications, place of delivery or delivery schedules, methods of shipment and packaging, and property and services furnished by SELLER. If any such change causes an increase or decrease in the price of this agreement or in the time required for its performance SELLER or OCTA shall promptly notify the other party thereof and assert its claim for adjustment within (30) days after the change is ordered, and an equitable adjustment shall be made. However, nothing in this clause shall excuse SELLER from proceeding immediately with the agreement as changed.

**DEFAULT AND EXCESS REPROCUREMENT LIABILITY** - OCTA may terminate this agreement if a federal or state proceeding for the relief of debtors is undertaken by or against SELLER, or if SELLER makes an assignment for the benefit of creditors, or if SELLER fails after reasonable notice by OCTA to cure a deficiency in performance or lack of progress thereto, and OCTA shall have such additional remedies as may be available whether or not it so terminates this agreement, including but not limited to the payment by SELLER to OCTA of expenses incurred by OCTA in reprocuring elsewhere the same or similar items or services defaulted by SELLER hereunder.

**INDEMNIFICATION** - SELLER shall indemnify, defend, and save harmless OCTA from and against any loss, damage, claim, or harm for bodily injuries, including death or damage to property caused by SELLER or its employees, subcontractors, or supplies in connection with the performance of this agreement.

**ASSIGNMENTS AND SUBCONTRACTORS** - Neither this agreement nor any interest herein nor claim hereunder may be assigned by SELLER either voluntarily or by operation of law, nor may all or substantially all of this agreement be further subcontracted by SELLER without the prior written consent of OCTA. Withholding of consent shall not be deemed to relieve SELLER of its obligations to comply fully with the requirements hereof.

**FEDERAL, STATE, AND LOCAL LAWS** - SELLER warrants that in the performance of this agreement, it shall comply with all applicable Federal, State and local laws, statutes and ordinances and all lawful orders, rules and regulations thereunder.

**INFRINGEMENT INDEMNITY** - In lieu of any other warranty by OCTA or SELLER against copyright infringement, statutory, or otherwise, it is agreed that SELLER shall defend at its expense any suit against OCTA based on a claim that any item furnished under this agreement or the normal use or sale thereof infringes any United States Letters Patent or copyright and shall pay cost and damages finally awarded in any such suit, provided that SELLER is notified in writing of the suit and given OCTA, information, assistance at SELLERs expense for the defense of same. If the use or sale of said item is enjoined as a result of such suit, SELLER, at no expense to OCTA, shall obtain for OCTA the right to use and sell said item, or shall substitute an equivalent item acceptable to OCTA and extend this patent indemnity hereto.

**TITLE AND RISK OF LOSS** - Unless otherwise provided in this agreement, SELLER shall have title to and bear the risk of any loss of or damage to the items purchased hereunder until they are delivered in conformity with this agreement at the F.O.B. point specified herein, and upon such delivery title shall pass from SELLER and SELLERs responsibility for loss or damage shall cease, except for loss or damage resulting from SELLERs negligence. Passing of title upon such delivery shall not constitute acceptance of the item by OCTA.

**NOTICE OF LABOR DISPUTE** -Whenever SELLER has knowledge that any actual or potential labor dispute may delay this agreement, SELLER shall immediately notify and submit all relevant information to OCTA. SELLER shall insert the substance of this entire clause in any subcontract hereunder as to which a labor dispute may delay this agreement. However, any subcontractor need give notice and information only to its next higher-tier subcontractor.

**EQUAL EMPLOYMENT OPPORTUNITY** - In connection with the execution of this agreement, SELLER shall not discriminate against any employee or applicant because of race, religion, color, sex or national origin. SELLER shall take affirmative action to insure that applicants are employed and that employees are treated during their employment without regard to their race, religion, color, sex or national origin. Such actions shall include pay, or other forms of compensation and selection for training, including apprenticeship.

**PROHIBITED INTEREST** - A.)SELLER covenants that no member of, or delegate to, the Congress of the United States shall have any interest, direct or indirect, in the agreement or the proceeds hereof. B.) SELLER further covenants that, for the term of this agreement, no director, member, officer, or employee of the OCTA during his tenure in office or one (1) year thereafter shall have any interest, direct or indirect, in this agreement or the proceeds thereof.

**TERMINATION FOR CONVENIENCE** - The OCTA may terminate this agreement at any time by giving written notice to SELLER of such termination, effective on the date of such notice. Upon receipt of said notice, SELLER shall immediately take action not to incur any further obligations, costs, or expenses, except as may be reasonably necessary to terminate its activities. All finished or unfinished documents and other materials procured or produced by SELLER hereunder shall, at the option of OCTA, become OCTA property upon the date of such termination.

**AUDIT AND INSPECTION OF RECORDS** - SELLER shall provide OCTA such access to SELLERs books, records, and facilities as may be deemed necessary to examine, audit, and inspect all work data, documents, and activities related to the goods or services described herein. SELLER shall maintain such books, records, data and documents on a generally accepted accounting basis and shall clearly identify and make such items readily accessible to such parties during SELLERs performance hereunder and for a period of four (4) years from the date of final payment by OCTA hereunder.

FA-CAMM-019-B.doc (9/25/01) v13

**SERVICE LEVEL AGREEMENT**

During the term of this Agreement, SP360 will provide to Customer Standard Support Services as described below.  Customer may elect to purchase additional support services.  Standard Support Services include the following:

Managed Services:
- Monitor, manage, and remediate network and servers including administration infrastructure
- Operating System, Database Server, SharePoint patch and service pack level management
- Site availability monitoring and remediation
- Malware and virus protection
- Data backup and recovery with 30 day retention
- Security enforcement

General SharePoint Support Services:
- User account creation/deletion
- Password resets/ lockouts
- Domain name registration
- SSL certificate management

**Availability**

SP360 commits to 99.9% uptime and availability of the hosting services (the "99.9% Uptime Commitment"), excluding scheduled maintenance and other occurrences not constituting Downtime (as defined below).  In the event SP360 is unable to achieve the 99.9% Uptime Commitment in any month, SP360 will provide credit to Customer against the next monthly fee in an amount equal to the product of (x) number of hours during which the hosting services were unavailable that month due to Downtime, divided by (y) the total number of hours of hosting services scheduled for the month, multiplied by (z) the monthly fee.

**Classification and Resolution of Issues**

SP360 will classify, respond to and resolve a reported technical issue (an "Issue") as follows:

**Severity 1 Issues:**
- System down or major portions of the Services being down that impacts the availability of a Customer site or has highly degraded the site performance resulting in the inability to effectively use the site, with no known workaround.
- Security attack or threat, malware or virus that has circumvented SP360's security procedures.

SP360 will give the highest scheduling priority and devote its best available resources to respond to Severity 1 Issues within 15 minutes of notification.  SP360 will devote commercially reasonable efforts to provide Issue resolution for Severity 1 Issues within two hours after receipt of notification and verification of the Issue.

**Severity 2 Issues:**
- Non-critical site features or operations are not functioning correctly, but do not impact the entire site or all users.
- Reset client account passwords, unlock client accounts.
- Emergency backup or backup restoration

SP360 will give the next highest scheduling priority and devote its available resources to respond to Severity 2 Issues within two hours of notification of the Issue.  SP360 will devote commercially reasonable efforts to provide Issue resolution for Severity 2 Issues within twenty-four hours after receipt of notification and verification of the Issue.

**Severity 3 Issues:**
- Minor bug fixes.
- An incident that has little impact on site or user experience and can be handled on a scheduled basis.
- Problems affecting small group of users.

SP360 will give the next highest scheduling priority and devote its available resources to respond to Severity 3 Issues within four hours of notification of the Issue. SP360 will devote commercially reasonable efforts to provide Issue resolution for Severity 3 Issues within one calendar week after receipt of notification and verification of the Issue.

The above resolution times are estimates that may be impacted by a variety of variables beyond SP360's control. SP360 strives to address every ticket request with the goal of absolute responsiveness and the fastest path to resolution.

**PURCHASE ORDER A32131**
**EXHIBIT A**

**Monitoring**

In order to support the 99.9% Uptime Commitment (as defined below), SP360 proactively monitors 24 hours a day, 7 days a week, 365 days a year all network devices, servers, storage, and hosted SharePoint sites for performance and availability. If any issues are detected, alerts are automatically dispatched to the SP360 Systems Team, who will resolve the issue according to severity.

**Downtime**

Downtime is any unplanned period of time during which a Customer is unable to access the Services, except due to (1) a Scheduled Maintenance (as defined below), (2) any uncontrolled variable outside SP360's exterior firewall or physical data center that causes a service outage such as, but not limited to, issues relating to a telecommunications, Broadband or VPN provider, (3) any action, including, but not limited to, any unscheduled application or system change, taken by Customer or by an unauthorized third party on behalf of Customer, and (4) any actions relating to the application taken by Customer without the approval of SP360.

**Hours of Operation**

- **Standard Hours of Operation: 7:00 AM - 6:00 PM PST Monday – Friday (except holidays\*)**
  During standard hours of operation SP360 will respond to Severity 1, Severity 2 and Severity 3 Issues.

- **After-Hours Operation: 6:00 PM - 7:00 AM Monday - Friday, weekends and holidays\***
  Support during after-hours will be provided via an on-call system only for Severity 1 Issues.  Response to such Severity 1 Issues may be delayed for up to 1 hour from the standard response time set forth above.  Severity 2 and Severity 3 Issues will be responded to on the next business day.

  \*SP360 observes the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Day After Thanksgiving, and Christmas.  If any of the above holidays falls on a weekend, an adjacent weekday is observed as a holiday.

**Requesting Support**

- Customer shall call 1-877-819-6360 to speak to a SP360 Helpdesk technician, who will assign the appropriate resource for Issue resolution.  Customer may also request support by emailing support@sharepoint360.com. In all cases, Customer shall include as much information as possible to assist SP360's experts in diagnosing, prioritizing, and resolving ticket requests.

**Maintenance and Upgrades**

High-quality service and availability requires SP360 to perform routine maintenance and upgrades on its infrastructure and software applications. SP360's goal is to minimize the impact of downtime and potential outages on Customer.  Unless SP360 is responding to an emergency situation, all maintenance and upgrade activities are planned and communicated with Customer in advance.  Scheduled Maintenance includes the following:

| Service | Description | Downtime | Scheduled Maintenance | Notification |
|---------|-------------|----------|----------------------|--------------|
| Daily (Planned) | Routine maintenance and repairs, security updates, equipment replacement | 0 Hours | Monday - Saturday 10PM - 3AM PST | None |
| Minor (Planned) | Infrastructure maintenance, full backup and/or recoveries | Up to 4 hours | 1st and 3rd Saturday 10PM - 2AM PST | 4 and 2 days prior to service window |
| Major (Planned) | Network upgrades, software and hardware upgrades, OS and application patching, performance testing/ troubleshooting, changes to farm design, migrations | At least 4 hours.  If more than 12 hours, Customer will be notified in advance. | 3rd Saturday 10PM Sat - 12PM Sun PST | 10, 4, 2 days prior to service window |

**SCOPE OF WORK**

| Business Name | Orange County Transportation Authority |
|---|---|
| Contact | Bill Mao |
| Phone Number | (714) 560-5679 |
| E-mail Address | bmao@octa.net |
| Address | 550 South Main Street, PO Box 14184 |
| City, State, Zip | Orange, California  92863-1584 |

**PROJECT SUMMARY**

A.   CONSULTANT shall provide fully managed hosting solutions with 99.9% availability.  The hosting solution shall provide monthly Microsoft hot fix and security updates, managed backups, weekly and daily backup to offsite location, weekly offsite media rotation with Iron Mountain and enterprise system tools to monitor physical server and network infrastructure.

B.   CONSULTANT shall provide hosting of a SharePoint environment for 750 internal Users.  This will include redundant SharePoint servers and databases as well as active directory connectivity to the AUTHORITY's data center.

C.   CONSULTANT shall provide the setup of and hosted environment for OCTA Today.  Deliverables will include the setup of Virtual Server environments for Development, Staging and Production.  Additionally, AUTHORITY shall receive dedicated VPN access OCTA's Domain Controller.

**PROJECT APPROACH**

CONSULTANT will provide hosting services to AUTHORITY. To meet these objectives, CONSULTANT offers the following:

| Dedicated Hosting – SharePoint Enterprise | |
|---|---|
| Document Storage Space | Up to (2) Terabytes |
| Internet Connectivity | 10 Mbps |
| Users Included (Subscriber Access Licenses) | 750 |
| SharePoint Version | SharePoint Server 2010, Enterprise |
| SQL Server | 2008 R2 |
| Back-up | Daily Incremental; Weekly Full |
| Disaster Recovery (Weekly Full Back-up) | Weekly offsite rotation with Iron Mountain |
| Server Maintenance and Updates | Included |

| Server Licenses Required |
|---|
| Win 2008 R2 64-bit |
| SQL 2008 R2 |
| SharePoint 2010 Enterprise |

**PURCHASE ORDER A32131**
**EXHIBIT B**

**RESPONSIBILITIES OF AUTHORITY**

A. All support requests under this Scope of Work must be submitted by AUTHORITY through a support ticket to support@sharepoint360.com or by calling (619) 819-6360 and asking for "Support". Any support request that involves training, feature development or is deemed project oriented by CONSULTANT shall be considered outside this Scope of Work.

B. AUTHORITY will be available to answer questions, provide feedback, will allow access to any requisite graphics, as required and provide any other access or software and/or information which may be directly required in order to provide services to AUTHORITY during the period in which CONSULTANT is engaging with AUTHORITY.

C. AUTHORITY will provide CONSULTANT resources with sufficient security access to its systems and facilities during all reasonable times so that the scope of work as defined above can be accomplished.

D. AUTHORITY will provide timely access to all relevant project documentation, including without limitation system documentation, existing report layouts and templates, data schemas.

E. AUTHORITY's technical expert(s) will be made available to CONSULTANT to discuss any questions about future vision and current state of systems and/or functionality in a timely manner.

F. AUTHORITY's single point of contact from CONSULTANT will be established to streamline communications and to facilitate the overall success of the engagement and decisions will be made within 48 hours.

G. AUTHORITY shall be responsible for the contractual relationship with third parties and for ensuring that they cooperate with CONSULTANT.

**ASSUMPTIONS**

A. CONSULTANT will not be responsible for the performance of other contractors or vendors engaged by AUTHORITY, or delays caused by them, in connection with this project even if CONSULTANT has been involved in recommending or selecting such contractors or vendors, or in the monitoring of their work.

B. CONSULTANT will not be responsible for the acts or omissions of AUTHORITY or AUTHORITY's employees, agents, contractors, or vendors, or anyone gaining access to the network by means of AUTHORITY's passwords or equipment.

**FEES**

| Dedicated Hosting Costs | Rate |
|---|---|
| SharePoint 2010 Enterprise  hosting | $4,693.31/Month |
| One-time Set-up Fee | $4,693.31 |
| "Storage Space" up to (2) Terabyte of storage capacity | Included |
| SSL Certificate (Thawte) | Included |
|  |  |

**Additional Services**

- Each additional Gigabyte (GB) or fraction thereof above the amount of Storage Space listed above will be billed at $1.00 per GB per month.

- Each additional Mbps of Internet Connectivity will be billed at $58 per (1) Mbps per month.

- "Step Up License Fee" is based upon the assumption that AUTHORITY has the requisite licensing already purchased so that the $2.50/user Step Up License Fee would apply. If a user is not covered under the Microsoft EA agreement, then a $9/user fee will apply.

**PURCHASE ORDER A32131**
**EXHIBIT B**

- Additional Front End Server will be billed at $400 per month.

- Additional SQL Server will be billed at $500 per month.

AUTHORITY agrees to a term of 12 months, which shall commence on September 1, 2001 and end on August 31, 2012 ("Term"), at a rate of $4,693.31 per month, plus a one-time Set-up Fee of $4,693.31 for a total amount of $61,013.03.

In exchange for a 5% discount, AUTHORITY agrees to pay all fees in one full payment within 30 days of commencement of Term.  Such 5% discount equates to a reduction of $3,050.65, for a total reduced amount of $57,962.38.

**AGREEMENT FOR THE
FULLY MANAGED HOSTING SCOPE OF WORK
("AGREEMENT")**

1.      <u>Definitions</u>.  In addition to the definitions provided elsewhere in this Agreement, capitalized terms used herein shall have the following meanings:

        1.1      "<u>Anti-Terrorism Law</u>" means mean any Law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

        1.2      "<u>Authorized Users</u>" means persons authorized by AUTHORITY (and who have been allocated passwords designated by AUTHORITY) to access the Services through the Internet on personal computers or other terminals in the possession or control of such persons.

        1.3      "<u>Available</u>" or "<u>Availability</u>" means an Authorized User being able to establish a TCP connection to the appropriate server at the Hosting Facility.

        1.4      "<u>Business Day</u>" means any day other than a Saturday, Sunday or public holiday or a day on which banks are required or permitted to close under the laws of the State of California.

        1.5      "<u>AUTHORITY Affiliate</u>" means any entity which directly or indirectly controls, is controlled by or is under common control with AUTHORITY.  The term "control" as used herein means the possession of the power to direct or cause the direction of the management and the policies of an entity, whether through the ownership of a majority of the outstanding voting securities or by contract or otherwise.

        1.6      "<u>AUTHORITY Data</u>" means any and all data or information which is provided by AUTHORITY and personally identifies or relates to any of AUTHORITY's clients or customers, actual or prospective, including without limitation AUTHORITY's name, address, e-mail address, financial information or other personally-identifiable information.

        1.7      "<u>Governmental Authority</u>" means any government or political subdivision or regulatory authority, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision or regulatory authority, or any federal state, local or foreign court or arbitrator.

        1.8      "<u>Hardware</u>" means a computer, server, personal digital assistant, storage, network equipment, mobile devices or other device which can access, run or store the Software or AUTHORITY Data.

        1.9      "<u>Hosting Facility</u>" means the data center at which CONSULTANT will maintain computer hardware servers on which CONSULTANT hosts third-party application software, including the Software designated to perform the Services for AUTHORITY.  CONSULTANT may change the location of the Hosting Facility at any time during the Term.

        1.10      "<u>Law</u>" means any law, statute, code, ordinance, regulation, ruling, interpretation or other requirement of any Governmental Authority.

        1.11      "<u>Portal</u>" means an internet site or network of sites.

        1.12      "<u>Proprietary Rights</u>" means all of CONSULTANT's rights to the Software, or under which CONSULTANT is authorized to grant the License, including license rights, patent rights, copyrights, trade secret rights, sui generis database rights, and all other intellectual and industrial property rights anywhere in the world.

        1.13      "<u>Services</u>" means the information technology hosting services to be provided by CONSULTANT in accordance with this Agreement.

1.14    "Service Commencement Date" means the date on which CONSULTANT provides the access codes that enable AUTHORITY to send and receive information to use the Hosting Services.

1.15    "SLA" means the Service Level Agreement and support guidelines attached as Exhibit A.

1.16    "Software" means computer software developed by CONSULTANT and all of CONSULTANT's Proprietary Rights to the Software, which includes computer software licensed from Microsoft Corporation or one of its affiliates or distributors (collectively, "Microsoft"), and/or other companies, and may include associated media, printed materials, electronic or online documentation, libraries, content, and data.

1.17    "CONSULTANT Intellectual Property" means any secret, invention, drawings, designs, specifications, notes, work of authorship or protectable interest and other work, regardless of media, format, electronic or otherwise, developed, or conceived by CONSULTANT.

1.18    "Supplemental Service" means any service CONSULTANT provides to AUTHORITY other than the Hosting Services.

1.19    "System Requirements" means minimum hardware and operating system requirements sufficient to run, access, or store Software, and which may be changed from time to time in CONSULTANT's sole discretion with or without notice.

## 2.    Hosting and Support.

2.1    **Host Server**.  During the Term, provided AUTHORITY's account with CONSULTANT is current, CONSULTANT shall configure, install, house, maintain, modify and operate the Hardware and Software necessary to host AUTHORITY's Portal.  CONSULTANT will also perform those Supplemental Services that it agrees with AUTHORITY in writing to perform.  AUTHORITY shall be responsible for providing, verifying, updating, and uploading/downloading AUTHORITY Data to the CONSULTANT servers, and any and all files, pages, data, works, information and/or materials transmitted to and from the servers.

2.2    **Facility**.  CONSULTANT shall maintain a Hosting Facility where the servers are located. CONSULTANT shall select, provide, install, and configure at the Hosting Facility the hardware and the Software designed to meet the System Requirements.  CONSULTANT will be responsible for installing and configuring the Software on the server(s) located at the Hosting Facility.  CONSULTANT shall use commercially reasonable efforts to provide performance analysis, tuning services, and hardware preventative maintenance at the Hosting Facility.

2.3    **Availability**.  CONSULTANT shall provide availability and support in accordance with the SLA attached as Exhibit A.  CONSULTANT shall not be responsible for the inability of AUTHORITY or any Authorized User to connect to the Internet or for the availability of the Internet or AUTHORITY's private network, and any lack of access due to such failures shall not affect AUTHORITY's payment obligations hereunder, nor the calculation of uptime pursuant to the SLA.

2.4    **Lack of Access Due to Force Majeure**.  Should a Force Majeure Condition occur which reduces availability (other than during scheduled downtime) to less than 90% for 14 consecutive days, AUTHORITY shall have the option of terminating this Agreement upon written notice to CONSULTANT, in which case CONSULTANT shall cease to be obligated to supply the Services to AUTHORITY as of the date notice of termination is received by CONSULTANT.

2.5    **Storage and Security**.

2.5.1    AUTHORITY is solely responsible for maintaining the confidentiality of AUTHORITY's password and account information.  AUTHORITY acknowledges and agrees that AUTHORITY is solely responsible for all acts, omissions and use under and charges incurred with AUTHORITY's account or password or in connection with AUTHORITY's Portal.

2.5.2    AUTHORITY is solely responsible for migrating AUTHORITY's existing documents into AUTHORITY's Portal.  CONSULTANT can provide services that may include migration and/or upgrade services for a fee based on time and materials at CONSULTANT's then current standard hourly rates or fees.

2.5.3    AUTHORITY is solely responsible for data conversion, data entry, and verification of data.  AUTHORITY shall use reasonable security precautions in light of AUTHORITY's use of the Services, including encrypting any AUTHORITY Data transmitted to or from, or stored on, the CONSULTANT servers or storage devices AUTHORITY uses.

2.5.4    AUTHORITY shall bear full risk of loss and damage to all AUTHORITY Data, information, images, documents, and other content.  AUTHORITY shall be solely responsible for undertaking measures to: (i) prevent any loss or damage to AUTHORITY's content; (ii) maintain independent archival of AUTHORITY's content for periods in excess of 30 days; and (iii) ensure the security, confidentiality and integrity of AUTHORITY's content transmitted through or stored on CONSULTANT's servers.  CONSULTANT's servers and Services are not a long-term archive, and CONSULTANT shall have no responsibility for or liability with respect to AUTHORITY's content for any period in excess of 30 days.

2.5.5    In addition to AUTHORITY's security obligations, CONSULTANT shall take commercially reasonable measures to ensure the security, confidentiality, and integrity of the AUTHORITY Data and other proprietary information of AUTHORITY transmitted through or stored on the server, including (i) firewall protection, (ii) maintenance of independent archival and backup copies of the AUTHORITY Data and applications for 30 days; and (iii) reasonable protection from any network attack and other malicious harmful or disabling data, work, code or program.

2.5.6    CONSULTANT may conduct a forensics examination in the event of a compromise to AUTHORITY's server or account.  AUTHORITY shall cooperate with CONSULTANT's investigation of Service outages, security problems, and any suspected breach of this Agreement.

**3.**      **Licenses.**

3.1      **AUTHORITY License Grant**.  Subject to the terms and conditions of this Agreement, CONSULTANT grants to AUTHORITY, and AUTHORITY accepts, a non-exclusive, non-transferable, non-sublicensable, world-wide, royalty-free license for the Term to: (i) access and use the Services, and (ii) use any of CONSULTANT Intellectual Property included or embodied therein, in each case, solely for AUTHORITY's and AUTHORITY Affiliates' own internal business purposes, and subject to the terms and conditions of this Agreement.  Under this license, AUTHORITY may access the Services through an unlimited number and type of computers in any location.  Any rights granted to a AUTHORITY Affiliate hereunder shall cease on the date that such AUTHORITY Affiliate ceases to be a AUTHORITY Affiliate. AUTHORITY's License to host AUTHORITY's Portal on CONSULTANT's server is subject to such hosting policies, guidelines and specifications as CONSULTANT may reasonably establish from time to time.

3.2      **Authorized Users**.  AUTHORITY may designate any number of Authorized Users, provided that AUTHORITY obtains a separate license for and pays the license fee specified in the above Scope of Work for each such Authorized User.  AUTHORITY may decrease the number of Authorized Users only at the end of either the Initial Term or any Renewal Term.  AUTHORITY shall be responsible for the confidentiality and use of its Authorized Users' identifications and passwords.  AUTHORITY shall be responsible for all electronic communications (including maintenance of AUTHORITY Data) and the sending of messages ("Electronic Communications") entered through or under an Authorized User's identification and/or password(s).  CONSULTANT may presume any Electronic Communications sent by AUTHORITY comply with applicable law and have been sent by an Authorized User, and shall be permitted to rely thereon for all purposes.  AUTHORITY agrees to promptly notify CONSULTANT if it becomes aware of any loss or theft of an Authorized User's identification and/or password(s) or any unauthorized use of the Services and/or identification and/or password(s) used in connection therewith.

3.3 **License Governed by Microsoft SPUR**.  In addition to the terms of this Agreement, each License hereunder is also subject to the Microsoft Licensing Services Provider User Rights ("SPUR").  Microsoft publishes the SPUR on a designated Microsoft website, and may revise the SPUR from time to time.  AUTHORITY agrees to check such Microsoft website during the Term sufficiently frequently to be aware of any revisions to the SPUR.  AUTHORITY expressly agrees to abide by the SPUR as it may be revised from time to time.

3.4 **CONSULTANT License**.  During the Term, AUTHORITY grants to CONSULTANT a non-exclusive, worldwide, royalty free license, to copy, use and transmit the AUTHORITY Data to the extent required to provide the Hosting Services, making backup copies thereof, and granting access to AUTHORITY's Portal to Authorized Users.

4. **Confidentiality**.

4.1 Each party acknowledges it may receive Confidential Information (defined below) or other proprietary data and information of the other (and/or of the other's affiliates, suppliers, customers, or business partners) while performing under this Agreement (collectively, "Proprietary Information") and each party agrees it has no interest in or, except as expressly provided herein, no right to use such Proprietary Information of the other party. For purposes of this Task 4, "Confidential Information" shall mean all information disclosed by the disclosing party to the receiving party hereunder, whether tangible, intangible, written, oral, embedded or expressed in computer code, or by any other means that: (a) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or Use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Each party shall keep strictly confidential and not use or disclose to any third party, except as provided herein, any Proprietary Information of the other party; provided, however, that the foregoing obligations of confidentiality and non-use shall not apply to the extent that any Proprietary Information is demonstrated by written records to be: (a) already known to the receiving party or its affiliates at the time of disclosure hereunder (provided such receiving party and its affiliates comply with any restrictions imposed by third parties); or (b) hereafter developed by the receiving party or its affiliates in the course of work entirely independent of any disclosure hereunder; or (c) publicly known prior to or after disclosure hereunder other than through acts or omissions of the receiving party or its affiliates; or (d) disclosed by a third party in good faith to the receiving party or its affiliates under a reasonable claim of right with respect to which the receiving party and its affiliates is not aware of any dispute. The receiving party may also disclose Proprietary Information to the minimum extent required by law, provided that the receiving party provides prompt notice to the disclosing party, and the receiving party shall reasonably cooperate with the disclosing party if the disclosing party seeks a protective order or other appropriate remedy to protect the confidentiality of such information.

4.2 The parties hereby agree that any breach of any provision hereof regarding confidentiality or protection of Proprietary Rights would constitute irreparable harm, and that the aggrieved party shall be entitled to specific performance and/or injunctive relief in addition to other remedies at law or in equity.

4.3 Upon termination and as otherwise requested by the disclosing party of its Proprietary Information, the receiving party will promptly return to the disclosing party all items and copies containing or embodying such Proprietary Information, except that each party may permit its attorneys to keep one archival copy, and keep a personal copy of its compensation records and this Agreement.

5. **Backup**.  The Services include backup/archival for a 30-day period only.  CONSULTANT is not obligated to provide longer term backup services unless AUTHORITY has purchased and CONSULTANT has agreed to provide such extended backup services. CONSULTANT does not promise to retain the data back up for longer than the agreed data retention period.  AUTHORITY acknowledges and agrees that purchasing such extended backup services may require additional downtime to install and maintain.  AUTHORITY further acknowledges and agrees that in utilizing any such backup services, AUTHORITY shall be subject to a maximum disk usage and bandwidth usage as specified by CONSULTANT.  Subject to the terms and conditions of this Agreement and any additional terms and conditions governing such extended backup services, CONSULTANT shall use commercially reasonable efforts to provide such services on a 24 hours a day, seven (7) days a week basis throughout the period of AUTHORITY's subscription to such services.  AUTHORITY acknowledges that such services are subject to a 24 hour data loss.  AUTHORITY also

acknowledges that recovery efforts will take at least 24 hours but could take considerably more time depending on the amount of data being recovered and the cause of the loss.  AUTHORITY acknowledges that from time to time these services may be inaccessible or inoperable for any reason, including without limitation: (a) equipment malfunctions; (b) periodic maintenance procedures or repairs that CONSULTANT may undertake from time to time; or (c) causes beyond the control of CONSULTANT or that are not reasonably foreseeable by CONSULTANT, including, without limitation, Force Majeure Conditions, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

**6.**    **Warranty Disclaimer**.  CONSULTANT does not promise that the Services will be uninterrupted, error-free, or completely secure.  AUTHORITY acknowledges that there are risks inherent in Internet connectivity that could result in the loss of AUTHORITY Data.  CONSULTANT disclaims any and all warranties not expressly stated in this Agreement and the SLA, including the implied warranties of merchantability, fitness for a particular purpose, and non-infringement.  Unless otherwise agreed, all Supplemental Services are performed on an "AS IS, AS AVAILABLE" basis. Each party recognizes and agrees that the warranty disclaimers and liability and remedy limitations in this Agreement are material bargained for bases of this Agreement and that they have been taken into account and reflected in determining the consideration to be given by each party under this Agreement and in the decision by each party to enter into this Agreement.

**7.**    **Limitations of Liability**.

7.1    In no event shall CONSULTANT be liable for any lost revenue, lost profits, direct or indirect, special, incidental, consequential or punitive damages, however caused and under any theory of liability, whether in contract, tort (including negligence and strict liability) or otherwise, arising out of this agreement, even if advised of the possibility of such damages, and notwithstanding any failure of purpose of any limited remedy.

7.2    In no event shall CONSULTANT be responsible for loss of data or records of AUTHORITY or any third party beyond the 30-day backup period included in the Services, unless extended backup is purchased by AUTHORITY.  AUTHORITY shall be responsible for ensuring proper and adequate backup and storage of AUTHORITY Data for any additional period.

7.3    Except for claims based on CONSULTANT's willful misconduct, the maximum aggregate monetary liability of CONSULTANT under any theory of law (including breach of contract, tort, and strict liability) shall not exceed six (6) times the monthly fee payable in accordance with the above Scope of Work in effect for the Services at the time of the occurrence of the event(s) giving rise to the claim.

**8.**    **Indemnity**.

8.1    **Indemnity by CONSULTANT**.  CONSULTANT shall defend AUTHORITY and its directors, officers, and employees (collectively, the "AUTHORITY Indemnitees"), against any third-party claims arising out of (i) CONSULTANT's actual or alleged gross negligence, willful misconduct, or violation of Law (ii) any breach by CONSULTANT of this Agreement, or (iii) a claim by a third party alleging that the Services infringe on any intellectual property of a third person (each, a "AUTHORITY Indemnified Claim"), and indemnify the AUTHORITY Indemnitees from the resulting losses, damages, and costs and expenses (including reasonable attorneys' fees) awarded to the third party by a court of competent jurisdiction or pursuant to a settlement agreement (collectively, "Damages"). The AUTHORITY Indemnitees shall give prompt notice of any AUTHORITY Indemnified Claim to CONSULTANT. CONSULTANT may settle, at its sole expense, any AUTHORITY Indemnified Claim for which CONSULTANT is responsible under this section.  The AUTHORITY Indemnitees may employ counsel at their own expense and participate in the defense and/or settlement of any Claim.  The foregoing indemnification obligation will not apply to claims primarily resulting from the negligence or willful misconduct of a AUTHORITY Indemnitee.

8.2    **Indemnity by AUTHORITY**.  AUTHORITY shall defend CONSULTANT and its managers, directors, officers, and employees (collectively, the "CONSULTANT Indemnitees"), against any third-party claims arising out of (i) any actual or alleged AUTHORITY negligence, willful misconduct, or violation of Law, (ii) any breach by AUTHORITY of this Agreement, or (iii) any violation of AUTHORITY's agreement with users of the Services (each, an

"CONSULTANT Indemnified Claim"), and indemnify the CONSULTANT Indemnitees from the resulting Damages. The CONSULTANT Indemnitees shall give prompt notice of any CONSULTANT Indemnified Claim to AUTHORITY. AUTHORITY may settle, at its sole expense, any Claim for which AUTHORITY is responsible under this section, subject to the reasonable approval of CONSULTANT. The CONSULTANT Indemnitees may employ counsel at their own expense and participate in the defense and/or settlement of any AUTHORITY Indemnified Claim. The foregoing indemnification obligation will not apply to Claims, if and only to the extent, such Claims are finally adjudicated to have been primarily caused by the gross negligence or willful misconduct of an CONSULTANT Indemnitee.

9.      **AUTHORITY Representations and Warranties**.  AUTHORITY represents and warrants that:

(a)      AUTHORITY has the power and authority to enter into and perform its obligations under this Agreement.

(b)      The AUTHORITY Data (and any software, hardware or application supplied by AUTHORITY) does not and shall not contain any content, data, work, materials, or services that actually or potentially violate any applicable law or regulation or infringe or misappropriate any proprietary, intellectual property, or contract right of any person or entity.

(c)      AUTHORITY owns the AUTHORITY Data, and all proprietary or intellectual property rights therein or has express written authorization from the owner to copy, use, and display the AUTHORITY Data.

(d)      The AUTHORITY Data does not contain any virus or harmful component.  AUTHORITY shall indemnify and hold CONSULTANT harmless from any and all claims related to such content.

(e)      All registration information provided by AUTHORITY on behalf of each Authorized User is complete and accurate.

(f)      If acting on behalf of a separate legal entity, AUTHORITY has the authority to bind all Authorized Users of the Software on behalf of such entity.

(g)      AUTHORITY and all Authorized Users consent to be bound by, and become parties to this Agreement.  If AUTHORITY or any Authorized Users do not agree to (or cannot comply with) all of the terms and conditions of this Agreement, neither AUTHORITY nor any User on whose behalf AUTHORITY is acting will be authorized through AUTHORITY to use the Services.

(h)      AUTHORITY shall be responsible for ensuring that all Authorized Users or employees of AUTHORITY comply with the terms and conditions of this Agreement.

10.     **Compliance with Laws**.  AUTHORITY shall comply with all applicable Laws relating to its use of the Services. Records maintained and produced for AUTHORITY may be subject to examination by such Governmental Authority as may have jurisdiction over AUTHORITY's business to the same extent as such records would be subject if maintained by AUTHORITY on its own premises. CONSULTANT is authorized to give all reports, summaries, or information contained in or derived from the data or information in CONSULTANT's possession relating to AUTHORITY when formally requested to do so by an authorized Governmental Authority.

11.     **Export and Patriot Act Matters**.  AUTHORITY represents and warrants that it is not on the United States Department of Treasury, Office of Foreign Asset Controls list of Specially Designated National and Blocked Persons and is not otherwise a person to whom CONSULTANT is legally prohibited to provide the Services. AUTHORITY may not use the Services for the development, design, manufacture, production, stockpiling, or use of nuclear, chemical or biological weapons, weapons of mass destruction, or missiles, in a country listed in Country Groups D:4 and D:3, as set forth in Supplement No. 1 to the Part 740 of the United States Export Administration Regulations, nor may customer provide administrative access to the Service to any person (including any natural person or government or private entity) that is located in or is a national of Cuba, Iran, Libya, Sudan, North Korea or Syria or any country that is embargoed or highly restricted under United States export regulations.  AUTHORITY further represents,

warrants and covenants that (i) AUTHORITY is not in violation of, and will not violate, any Anti-Terrorism Law, and (ii) AUTHORITY does not and will not knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**12.**    **Suspension of Services**.  CONSULTANT may suspend Services without liability if: (i) CONSULTANT reasonably believes that the Services are being used in violation of the Agreement; (ii) AUTHORITY fails to cooperate with CONSULTANT's investigation of any suspected violation of this Agreement; (iii) there is an attack on AUTHORITY's server, AUTHORITY's server is accessed or manipulated by a third party without AUTHORITY's consent, or there is another event with respect to which CONSULTANT reasonably believes that the suspension of Service is necessary to protect the CONSULTANT network or other customers, or (iv) required by law.  CONSULTANT will give AUTHORITY advance notice of a suspension under this section unless CONSULTANT determines in its reasonable judgment that a suspension on contemporaneous notice is necessary to protect CONSULTANT or its other customers from imminent and significant operational or security risk.

**13.**    **Term and Termination.**

   13.1    **Termination by AUTHORITY**.  AUTHORITY may terminate this Agreement prior to the expiration of the Term upon not less than 90 days' prior written notice to CONSULTANT, subject to the payment of all payment obligations of AUTHORITY hereunder.

   13.2    **Termination by CONSULTANT**.    CONSULTANT may terminate this Agreement prior to the expiration of the Term as follows:

          (a)    if AUTHORITY fails to pay any fee, charge or any other amount owed by AUTHORITY to CONSULTANT within 10 days following written notice to AUTHORITY of such delinquency; or

          (b)    upon the 30th day after CONSULTANT notifies AUTHORITY that AUTHORITY is in default of this Agreement if AUTHORITY fails to cure the default within such 30-day period.

          (c)    any representation or warranty made by AUTHORITY in this Agreement  fails to have been true when made or later becomes untrue;

          (d)    AUTHORITY or any employee or agent of AUTHORITY discloses or threatens to disclose confidential or proprietary information of CONSULTANT; or

          (e)    AUTHORITY poses a material risk of security breach as to the Services, CONSULTANT's systems generally, or any applications provided to other customers of CONSULTANT.

   13.3    **Termination by Either Party**.  Either party may immediately terminate this Agreement upon notice to the other in the event such other party (or any permitted successor) ceases to do business as  a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, is the subject of receivership, or in the event any substantial part of the other's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or Governmental Authority without being released or satisfied within 10 days thereafter.

   13.4    **Termination for Infringement Claim**.  If CONSULTANT or any of its customers is faced with a credible claim that the Services infringe on the intellectual property rights of a third party, and CONSULTANT is not reasonably able to obtain the right to use the infringing element or modify the Services such that they do not infringe, then CONSULTANT may terminate the Services on reasonable notice of at least 30 days, and will not have any liability on account of such termination except to refund amounts paid for Services not used as of the time of termination.

   13.5    **Termination or Expiration Payments**.  Upon termination or expiration, AUTHORITY shall within 15 days pay all previously unpaid fees for the Service accrued through the effective date of expiration or termination.

In the event that AUTHORITY terminates this Agreement pursuant to Section 14.2(b), AUTHORITY shall pay CONSULTANT an early termination charge equal to the to the minimum monthly fee times the number of months remaining in the Initial Term or Renewal Term, as the case may be.  In the event of breach or termination by CONSULTANT other than termination due to AUTHORITY's breach, AUTHORITY shall be entitled to any pre-paid fees and relieved of any further financial liability to CONSULTANT.

13.6    **Effect of Termination or Expiration**.  Upon the termination or expiration of this Agreement, all licensed rights granted to AUTHORITY pursuant to this Agreement shall terminate immediately, and AUTHORITY shall promptly discontinue all further use of the Services.  Immediately upon termination or expiration of this Agreement: (a) AUTHORITY shall promptly release any Internet protocol numbers, access codes, addresses or address blocks assigned to AUTHORITY in connection with the Service (but not any URL or top level domain or domain name), and agree that CONSULTANT may take steps to change or remove any such addresses.  (b) AUTHORITY's license as to all Software and the Portal shall terminate; (c) each party shall return to the other party, or certify the destruction of, all proprietary information of the other party in whatever medium or form it exists; and (d) AUTHORITY shall transfer AUTHORITY' Portal content and any related information or data in a manner of AUTHORITY's choosing.  Moving AUTHORITY's content off of CONSULTANT's servers upon any termination or expiration shall be AUTHORITY's responsibility, and AUTHORITY shall complete the migration of all AUTHORITY content within 30 days of the effective date of any expiration or termination.  CONSULTANT will provide transitional services upon written request from and further agreement with AUTHORITY at CONSULTANT's then current standard hourly rates.

13.7    **Survival**.  Expiration or termination of this Agreement will not relieve AUTHORITY of AUTHORITY's obligation to pay any fees or other payments which have accrued and are due to CONSULTANT, or which arise from any obligation which arose during the Term.  Any election to terminate under this section will not limit either party's right to seek equitable or other appropriate relief in relation to any breach.  Notwithstanding anything to the contrary herein, the terms and conditions of Sections 1 (Definitions), 4 (Confidentiality), 7 (Warranty Disclaimer), 8 (Limitation of Liability), 9 (Indemnity), 14 (Term and Termination), and 15 (General Provisions) shall survive and continue in full force and effect after expiration or termination of this Agreement.

14.    **General Provisions.**

14.1    **Relationship between the Parties**.  In all matters relating to this Agreement, each party is an independent contractor and not an agent, partner, or representative of any other party.  Neither party shall have or represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other party, nor to represent the other party as agent, partner, joint venturer, employee or in any other capacity.  This Agreement shall not be interpreted or construed to create an association, joint venture or partnership between the parties or to impose upon any party any partnership obligation or liability.  Notwithstanding anything to the contrary, nothing in this Agreement limits in any way CONSULTANT's business of developing and marketing applications and licensing them to, and hosting them for, third parties, regardless of whether such third parties are or may be AUTHORITY's competitors for this project.

14.2    **Agreement Not to Hire Employees**.  Neither party shall solicit personnel of the other party for the purpose of inducing them to join such other party's employ or engaging them as an independent contractor during the term of this Agreement or for a one-year period following the termination or expiration of this Agreement.  Notwithstanding the foregoing, this section shall not apply to unsolicited employment inquiries nor prohibit either party from posting job openings on its web site or otherwise advertising job openings through industry or mass-media publications, recruitment web sites, or generally advertised job fairs, or from responding to and hiring or engaging individuals who initiate contact with such party concerning job opportunities.

14.3    **Severability**.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall not be deemed null and void and shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of this Agreement in that particular jurisdiction in which such adjudication is made.  In the event any provisions of

this Agreement relating to the time period, scope of activities or areas of restrictions shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope of activities or area such court deems reasonable and enforceable, the time period, scope of activities or areas of restrictions shall thereafter be deemed the maximum which such court deems reasonable and enforceable. All provisions not affected by any such invalidity shall remain in full force and effect to the fullest extent possible consistent with the intent of the parties.

14.4    **Notices**. All notices, requests, demands, and other communications made in connection with this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand or express delivery service, (b) on the date of receipt if sent by email before 4 p.m. on a Business Day, or on the next Business Day if sent after 4 p.m. on a Business Day or sent on a non-Business Day, or (c) four (4) calendar days after ailing, if mailed with proper postage, by certified or registered mail, postage prepaid, return receipt requested, in each case addressed to the other party as set forth below:

**Orange County Transportation Authority**
Address for notice:
550 South Main Street
PO Box 14184
Orange, California  92863-1584
Attention: Bill Mao
Email: bmao@octa.net

**SharePoint360, LLC**
Address for notice:
701 B Street, Suite 1601
San Diego, CA 92101
Attention: Kevin Harris
Email: kharris@sharepoint360.com

14.5    **Assignment**. Neither party will assign any rights, duties, or privileges under this Agreement without the prior written consent of the other party, except that CONSULTANT may assign its right, duties, or privileges to a successor in interest to all or a majority of its business, assets, or ownership interests and CONSULTANT may assign this Agreement to any parent, subsidiary, affiliate, or related party with 30 days' notice to AUTHORITY. Subject to the foregoing, this Agreement is binding on and inures to the benefit of the successors-in-interest and assigns of each party to this Agreement.

14.6    **Entire Agreement**. This Agreement, together with the exhibits, constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all other oral or written representations, understandings or agreements relating to the subject matter hereof. AUTHORITY represents and agrees that AUTHORITY is not relying on any representations of CONSULTANT other than those expressly made in this Agreement. This Agreement may be amended or modified only in writing and signed by both parties.

14.7    **No Waiver**. The waiver or failure of either party to exercise in any respect any right provided for in this Agreement will not be deemed a waiver of further rights under this Agreement. No provision of this Agreement may be waived (either generally or in any particular instance and either retroactively or prospectively) except with the prior written consent of the parties. This Agreement shall control over additional or different terms of any purchase order, confirmation, invoice, or similar document, even if accepted in writing by both parties, and that waivers and amendments shall be effective only if made by non-preprinted agreements clearly stated by both parties to be an amendment or waiver of this Agreement.

14.8    **Governing Law**. This Agreement shall be governed by, and construed in accordance with, the applicable laws of the State of California, without giving effect to the choice of law principles thereof. Neither the Uniform Computer Information Transactions Act nor the United Nations Convention for the International Sale of Goods shall apply to the interpretation or enforcement of this Agreement.

14.9    **Arbitration**. Any dispute or controversy arising from or related to this Agreement or the rights of the parties to this Agreement shall be settled by binding arbitration in San Diego, California, before a single arbitrator administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules in effect

at the time a demand for arbitration is made.  The decision of the arbitrator, including but not limited to the determination of the amount of any damages suffered or the right to an injunction, will be exclusive, final, and binding on all parties, their successors and assigns, as applicable, and judgment thereon may be entered in any court of competent jurisdiction.  The costs of arbitration, including the arbitrator's fees, as well as reasonable attorneys' fees shall be awarded to the party determined by the arbitrator to be the prevailing party.  Notwithstanding the foregoing, AUTHORITY recognizes and acknowledges that a Use of the Software in a manner inconsistent with the provisions of this Agreement may cause CONSULTANT irreparable damage for which other remedies may be inadequate, and CONSULTANT will have the right to obtaining injunctive relief in any court of competent jurisdiction. AUTHORITY will not oppose such injunctive relief on the grounds that an adequate remedy is available at law.

     14.10   **Force Majeure**.   Neither party will be liable to the other party for failure or delay in the performance of a required obligation if such failure or delay is caused by strike, riot, fire, flood, earthquake, civil unrest, interruption, error, or malfunction resulting from natural disaster; transportation problems; defects, or malfeasance of third-party software, hardware, communications, or power supplies; actual or threatened war (whether or not declared); actual or threatened terrorist acts; acts or omissions of persons not hired, retained, or supervised by the other party; Acts of God; and other acts, events, or circumstances beyond its reasonable control, whether or not foreseeable or identified (any of which a "Force Majeure Condition").

     14.11   **Headings**.   The section headings in this Agreement are for reference purposes only and shall be disregarded in interpreting this Agreement.

**EXHIBIT A**
**SERVICE LEVEL AGREEMENT**

**Monitoring**
SP360's goal is to always honor our service commitment of a 99.9% uptime.  Therefore, SP360 is continuously refining its monitoring and incident notification systems.  SP360's entire infrastructure is actively monitored 24/7 for any outages, failures or security threats.  In the event issues are detected, a notification is instantly dispatched to our datacenter administration team for rectification and communication to our Customer, if required.

**Availability**
Excluding scheduled maintenance and upgrades (as shown below), SP360 commits to 99.9% uptime.  In the event SP360 is unable to achieve 99.9% uptime in any month, SP360 will provide credit to Customer against the next monthly fee in an amount equal to the product of (x) number of hours during which the Services were unavailable that month (other than scheduled downtime), divided by (y) the total number of hours of Service scheduled for the month, multiplied by (z) the monthly fee.

**Maintenance and Upgrades**
High-quality service and availability requires us to perform routine maintenance and upgrades on both our infrastructure and software applications.  SP360's goal is to minimize our Customer's impact of downtime and potential outages.  Unless SP360 is responding to an emergency situation, all maintenance and upgrade activities are planned and communicated with the Customer well in advance.   Below is SP360's possible scheduled maintenance:

| Service | Description | Scheduled Maintenance Windows | |
|---|---|---|---|
| Daily (planned) | Routine maintenance and repairs, security updates, equipment replacement.  Minimal disruption, if any. | Monday-Saturday | 10:00pm–3:00am PST |
| | | Notification: | None |
| Minor (planned) | Daily (above), plus: network upgrades, infrastructure maintenance, full back-up, recoveries, and/or roll-to-production of customer requested site changes.  Minimal disruption.  Notification will be given on the Wednesday and the Friday preceding the Saturday the work is to be performed. | 1st and 3rd Weekends  Notification: | Saturday  8:00  pm  to 8:00 am Sunday PST  4  and  2  Days  Prior  to Service |
| Major (planned) | Software and hardware upgrades.  Potential disruption.  Notification will be given 10 Days prior and the Wednesday and the Friday preceding the Saturday the work is to be performed. | As needed:  Notification: | Saturday  8:00  pm  to 8:00 am Sunday PST  10, 4 and 2 Days Prior to Service |
| Critical (unplanned) | Service will cause disruption. | As Required | |

**PURCHASE ORDER A32131**
**EXHIBIT B**

| Service | Description | Scheduled Maintenance Windows |
|---------|-------------|-------------------------------|
| | Customer will be notified immediately via email. Customer will be notified immediately following completion of service.  An incident report will be delivered, via email, no later than 48 hours after the rectification of an unscheduled outage.  Report will detail the cause of the outage and the steps necessary to prevent the incident from happening in the future. | |

**Downtime**

Downtime is defined as any unplanned period of time that a Customer is unable to access their hosted application for which they have been granted permissions.  Downtime shall not include the following:

| Type of Downtime | Description |
|------------------|-------------|
| Maintenance | Scheduled outages and outages occurring with defined schedules for routine network, hardware, or service maintenance or upgrades. |
| Upgrade | Roll-to-production of customer requested site changes. |
| Uncontrollable Conditions | Downtime as a result of any uncontrolled variable outside our exterior firewall or physical datacenter that causes an outage in service. |
| Adverse Customer Action | Downtime caused by Customer's actions or actions taken by 3rd party on behalf of Customer.  Actions include, but are not limited to, any applications and/or system changes. |

**Support**

In addition to the above, we offer technical support for our Customer's sites and services in an industry standard tiered support system. Details of this support system are as follows:

- **Standard Hours of Operations: 8-5 PST Monday - Friday**
  During Standard hours of operations you can expect full response listed in the Ticket Severity Matrix below.

- **After Hours Operations: 5PM-8AM Monday - Friday, Weekends and Holidays**
  After hours we use an on call system.  We will begin work to resolve High Priority tickets during this time, and may be delayed up to 1 hour from the Ticket Severity Matrix below. Medium and Low Priority tickets will be responded to the next business day.

- **Requesting Support**
  The preferred method of requesting support is to email support@sharepoint360.com. This will auto generate a support ticket in our system. The ticketing system will use the subject of the email as the title of the ticket, and the body of the email as the comments on the ticket. Additionally, content can be uploaded to the ticket as well, such as documents, and screen shots. It is important there is as much information as possible to assist our technicians in prioritizing ticket requests.

- Additionally, you have the option to call support by dialing 877-819-6360 and a Helpdesk technician will assist you creating a ticket and will assign the appropriate support resource for assistance.

**Ticket Severity Matrix**

**PURCHASE ORDER A32131**
**EXHIBIT B**

| Priority | Example | Response Time | Est. Resolution Time |
|----------|---------|---------------|----------------------|
| High | System Down, page unavailable, services unavailable, applications unavailable | 30 minutes | 2 hours |
| Medium | User account issue, slow performance | 2 Hours | 4 Hours |
| Low | Add/remove User | 24 Hours | 72 hours |

Resolution time is only an estimate, as it can be impacted by many variables that often are beyond SP360's control. We approach every ticket request with the utmost priority and the fastest path to resolution.